Filed 10/2/25  In re Anthony C. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ANTHONY C., a Person Coming Under Juvenile Court Law. | B343797 <br><br> (Los Angeles County Super. Ct. No. CK83027) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>  Plaintiff and Respondent, <br><br>  v. <br><br> N.C., <br><br>  Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

_____

In July 2012, the juvenile court terminated jurisdiction over minors Anthony C. (born March 2008) and Aliyah B. (born November 2009) after ordering a legal guardianship with the children's paternal grandmother (PGM) serving as the guardian.

Twelve years later, appellant mother N.C. brought a petition under Welfare and Institutions Code section 388, asking the court to reinstate jurisdiction to "enforce" her visitation with Anthony, and to "explore potential termination of the guardianship if it is determined that the legal guardian is neglecting the child's needs and if the child no longer wishes to reside there."[1]  Respondent Los Angeles Department of Children and Family Services (DCFS) recommended the court deny the petition, and the court did so without an evidentiary hearing.

On appeal, Mother contends the court erred in denying her an evidentiary hearing because she presented a prima facie case of both changed circumstances and that her request was in Anthony's best interest.  We conclude the court did not err in denying Mother's petition both because Mother's requested relief was moot and because substantial evidence supports the court's conclusion that the requested relief was not in Anthony's best interest.  We therefore affirm without considering whether the

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

court erred in finding Mother failed to demonstrate changed circumstances.[2]

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *The Court Sustains a Petition*

When Mother gave birth to Aliyah in November 2009, both tested positive for methamphetamine. Mother denied using methamphetamine but could provide no explanation for the test results. DCFS convened a "Team Decision Making" (TDM) meeting with the parents and Mother agreed, among other requirements, to participate in drug treatment and testing. In January 2010, a voluntary reunification contract was initiated; Anthony and Aliyah were placed with PGM. Mother attended programs until May 2010 and then dropped out and stopped returning calls from the children's social worker (CSW). PGM reported that the maternal grandmother had stated Mother was using drugs again. Mother missed 11 drug tests between January and June 2010.

Another TDM meeting was held in July 2010, where Mother admitted she smoked marijuana daily, and that she last used methamphetamine in January 2010. Five days later, DCFS filed a petition under section 300, subdivisions (b) and (g) on behalf of Anthony and Aliyah. The petition alleged Mother had a history of drug use and was a current user of methamphetamine

---

[2] We note also that Anthony's legal guardianship will end when he turns 18 in March 2026, approximately six months from now.

[3] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

3

and marijuana, rendering her incapable of caring for her children.  The petition noted Mother had tested positive for methamphetamine at Aliyah's birth, and that "[r]emedial services failed to resolve the family problems in that the mother failed to regularly participate in a substance rehabilitation program and random drug testing."[4]  The court found a prima facie case for detention, and DCFS placed the children with PGM.[5]

In a conversation with a dependency investigator (DI) in August 2010, Mother admitted to using methamphetamine the night before Aliyah was born, saying it was "easy" to do, and that she "didn't think about what could happen."  Mother claimed she had a "couple of hits that night" and went into early labor.  Mother admitted to previously using methamphetamine but denied using around Anthony.  She stated she first tried methamphetamine when she was 15 years old and the last time she used it was around July 9, 2010.  She last smoked marijuana around July 23, 2010.

---

[4] The petition also alleged the children's father, Victor C., who was incarcerated, failed to provide them with the necessities of life.  Father is not a party to this appeal.

[5] While the minute order from the hearing states the children were placed with the maternal grandmother, this appears to be a typographical error as both parties and DCFS reports acknowledge the children were placed with PGM.

In September 2010, the court sustained an amended petition and declared the children dependents of the court.[6] Mother was granted monitored visits.

## B. *The Court Appoints PGM the Legal Guardian and Terminates Jurisdiction*

Mother attended a drug program from December 2010 to February 2011 and tested negative on January 27, February 14, February 25, and March 7, 2011. She also consistently visited the children, and DCFS permitted Mother to have four-hour, unmonitored visits. However, on March 10, 2011, Mother tested positive for amphetamine and methamphetamine. At the six-month review hearing, the court ordered further reunification services for Mother and reverted to monitored visitation.

Mother missed three drug tests in March and April 2011 but tested negative once in April as well. She stated she did not know why she relapsed in March. She reentered a drug program around May 2011 but left in July 2011 because she needed to find employment and because she was "having some problems with the program staff." Mother did not reenroll in another program; she missed drug tests in June and July 2021. In November 2021, the court terminated reunifications services for Mother. In July 2012, the court appointed PGM the legal guardian of both Anthony and Aliyah and terminated jurisdiction. The court's order granted visitation to Mother but left blank the space to specify the visitation schedule.

---

[6] Instead of stating Mother "failed to regularly participate in a substance abuse program," the amended petition stated she "failed to complete a substance abuse program."

### C. *The Court Denies Mother's First Section 388 Petition*

#### 1. Mother Files a Petition

In March 2022, Mother, who at the time lived in Washington, filed a section 388 petition, asking the court to return custody of Anthony to her.[7] Mother stated that, since the time PGM was made Anthony's guardian, Mother had obtained stable housing and had cared for two children their entire lives.[8] She also stated that for "a few years" now, she had been going to counseling and had "[her] life together." She added that Anthony lived with her for a year starting April 2020, and it "went very well." Mother claimed Anthony was attending school and adjusting well when PGM "came and got him without notice," and Anthony called her weekly asking when he could return. Mother asked the court to "[r]eturn custody back to me so my family could be reunited."

Attached to the petition was a letter from a YWCA "family advocate" working with Mother. The letter stated that Anthony lived with Mother from April 2020 to November 2021; that Mother discovered Anthony had not received any vaccinations while under PGM's care; that Mother had him vaccinated and enrolled in school, where he received good grades; that, since PGM retrieved Anthony, he was "failing in school," "struggling in California," and wanting to return to Mother; that Mother put the needs of her family first; and that Mother took good care of

---

[7] Mother simultaneously filed a section 388 petition asking for Aliyah's return.

[8] Mother was living with her son Victor C. (born September 2012) and daughter A.W. (born January 2014).

6

her nine-year-old son and eight-year-old daughter—presumably Victor and A.W.—both of whom had been in her care since birth.[9] Also attached to the petition were: (1) a notarized document entitled "Temporary Guardianship," in which PGM appointed Mother as "temporary guardianship [*sic*]" of Anthony from April 3, 2020 "until terminated by" PGM; (2) a declaration of a friend of Mother's, attesting to her "selfless . . . devotion" to her children, and recounting a statement from Anthony that he was proud to call Mother his mom; (3) a letter from a survivor advocate from a human trafficking program at API Chaya, describing Mother as proactive, resourceful, and sincere; and (4) a letter from a case manager for the Washington Anti-Trafficking Response Network who described Mother as an "outstanding community member who sets goals for her[self], and her children."

## 2.    DCFS Investigates

In April 2022, the court ordered DCFS to respond to Mother's petition and set a hearing "on whether the court should grant or deny an evidentiary hearing."

### (a)    Mother

In June 2022, a DI interviewed Mother remotely through a video call.  When the DI asked Mother the name of the facility where she had completed her classes and programs, Mother did not know, stating only that it was a faith-based program.  Mother then "began to get upset and stated, 'I didn't know you were going to ask all these questions and need all this.' "  Mother showed the DI a few certificates of completion, but they did not

---

[9] The family advocate did not explain how she knew how Anthony was faring in California or what he wanted.

indicate specifically what she completed. Mother also said "she was receiving substance abuse services and was being drug tested" but she "did not have the test results nor a letter of completion indicating that she received illicit substance abuse treatment."

When the DI asked Mother if she had completed any classes in Los Angeles during the open case, Mother "stated that she never attended Court or had an attorney," "that she was never told by the Court nor the Department of any services she had to complete," and "that she never had a social worker assigned to her nor did she ever speak to anyone from the Department of Children and Family Services." Mother claimed she learned of everything through PGM. However, Mother then claimed DCFS had informed her the case was closed and that a CSW had put her in a drug program to "get clean." Mother informed the CSW she could not attend the program "right now," so she asked DCFS to close the case, and Mother left for Portland. When the DI asked Mother to clarify given her previous statements that she had no contact with DCFS or a social worker, Mother became upset and said, "No, I left and close that case and I left [*sic*]." When the DI asked Mother if she had completed any of her case plan, Mother responded, "I didn't get anything. I just knew what she (referring to [PGM]) would tell me. I didn't have a worker in Los Angeles. I'm not going to say anything. I see you writing everything. You're contradicting everything I'm saying. I had nothing to do with this! You can call all this off!" Mother then walked off and began pacing.

After some time, Mother agreed to continue the interview. Mother stated that when she lived in Portland, she "did parenting, drug test, behavior program" but, when the DI asked

8

her why she did those classes, Mother responded, "I don't really know. I don't know, I don't know. I have short memory loss."

The DI asked Mother if she had participated in any services while living in Washington; Mother stated social workers had come to her house. When asked why, Mother reported, "Anthony was bullying kids at school and there was a case open for Anthony. And my parenting coach didn't like how he was treating me and yelling at me. She didn't like what she saw. He (Anthony) was giving me attitude." Mother denied the social workers were from Child Protective Services, describing them as "people from YWCA" and "[s]ervices that they were giving Anthony because he was screaming, mistreating my youngest kid. He (referring to the child, Anthony) feels like I left him behind. He (Anthony) said that I abandoned him. There was no one there to care for me emotionally and physically. I have PTSD, anxiety!" Mother claimed Anthony began having issues after he arrived in Washington, and that both she and Anthony received services for four months.

When the DI reminded Mother they had spoken in October 2021 and Mother had reported both that she was homeless and that she had used illicit drugs ten months prior, Mother denied saying either of those things. When the DI asked Mother when she last used illicit drugs, she stated it was before Anthony came to live with her. When asked where her children Victor and A.W. were when she used the drugs, Mother stated, "I went to classes. That's why I completed my classes." When the DI asked Mother her drug of choice, Mother responded, "I don't have all this right now. I should just forget about all this! I wasn't prepared for all this. You're bringing trauma to me! This isn't working." Mother clarified her reference to trauma was the DI "[t]alking about my

9

case and when my kids were taken away. It's still gonna be a fucken case! Everything I did is wrong!" Mother walked away, saying: "I don't even care! Fucken shit!" The DI heard Mother dialing from another phone and saying, "Can you please see me. I'm not feeling well." The DI asked Mother who she was speaking to and Mother responded it was her daughter's father. Mother appeared to still be upset and was crying; the DI asked Mother if she wanted to end the interview, but Mother did not respond. The DI ended the interview.

During the call, Mother claimed that when she had video calls with Anthony, she saw drugs and drug paraphernalia in the background, and that Father was living with PGM. These allegations triggered a DCFS investigation.[10]

### (b) Parenting Coach

The DI also spoke with a mental health professional that Mother called her parenting coach. The professional stated she had become involved with Mother because her youngest children's school attendance was poor. She had also met Anthony and opined Anthony was having a difficult time with Mother and his siblings. She stated CPS became involved because Anthony was "bullying his younger brother." The coach stated Mother had been "participating in parenting for about 2 years and recently took 2 months off" because Mother was "burnt out."

### 3. Mother Amends Her Petition

In July 2022, Mother amended her petition to add that she "completed a full substance abuse program with Exodus,

---

[10] The investigation resulted in the referral being closed "with no safety concerns."

aftercare, parenting, anger management," and that PGM was "struggling" to care for the children. Mother stated her belief that PGM was neglecting Anthony, "leading him to using marijuana, and failing in school." Mother claimed PGM had not addressed these issues and had "failed to followup [*sic*] with the appropriate medical immunizations for Anthony." Mother asked the court to "Reinstate jurisdiction----Order home of parent mother, or in the alternative, reinstate reunification services with unmonitored visits."

Accompanying the amended petition were: (1) a July 24, 2021 certificate for completing "Functional Family Therapy Program"; (2) a March 13, 2015 certificate for completion of "the Exodus Program"; (3) an October 6, 2014 certificate for completion of "Mommy, Daddy, and Me"; (4) an October 6, 2014 certificate for completion of "Parenting Education"; (5) a May 8, 2014 certificate for completion of "Anger Management"; (6) a July 4, 2014 certificate for completion of "Alcohol and Drug Education"; (7) a July 31, 2014 certificate for completion of "Relapse Prevention Group"; (8) a May 7, 2014 certificate for completion of "Life Skills Group"; and (9) a March 11, 2022 letter from Anthony's middle school stating he did not meet the requirements to participate in the eighth grade graduation because his GPA was 0.60.

### 4. DCFS Investigates Further

The DI attempted to speak with the provider of the programs from which Mother had obtained certificates but was told Mother would need to authorize the provider to speak with the DI. Mother agreed to do so but never did. When asked later whether she had provided the requested authorization, Mother

11

stated she had not and directed the DI to speak with her attorney if she had any questions.

Anthony told the DI he had never lived with Mother and "was just thinking of staying here" with PGM. He acknowledged living with Mother in Washington the previous year and described the situation as a "good experience," but stated he had more opportunities where he currently lived, and he felt more connected with his friends and family in his current living situation. He also said he did not talk with Mother "that often." When directly asked whether he wanted to try reunifying with Mother, Anthony responded, "Not at this time."[11]

### 5. The Court Denies Mother's Petition

In August 2022, the court denied Mother's petition without an evidentiary hearing because "there isn't really a change in circumstance, but if there were, it would not be in the best interest of these children at this time to return them home or to provide reunification services to the mother at this time."

### D. *The Court Denies Mother's Second Section 388 Petition*

### 1. Mother Files a Petition

In October 2024, Mother filed another section 388 petition about Anthony, asking the court to "[r]einstate jurisdiction to enforce mother's visitation, and to explore potential termination

---

[11] The DI also spoke with Aliyah, who said she did not want to live with Mother and referred to PGM's home as "my home." Aliyah voiced her desire to have PGM adopt her. A later DCFS report contained information that PGM's adoption of Aliyah would be finalized in November 2024.

of the guardianship if it is determined that the legal guardian is neglecting the child's needs and if the child no longer wishes to reside there." Mother claimed PGM "has reportedly been refusing to allow any visitation or contact between mother and the minor" and that Mother "has information and concerns received from relatives that the legal guardian is neglecting the child's medical needs and that the child no longer wishes to reside there." Mother argued her request was in Anthony's best interest because it was "detrimental" for Anthony "to have visits terminated unilaterally" and he should be "in a safe and nurturing home." The court again ordered DCFS to respond and set a hearing "on whether the court should grant or deny an evidentiary hearing."

### 2. DCFS Opposes Mother's Petition

DCFS interviewed various individuals about the issues raised in Mother's petition.

### (a) Anthony

A DI spoke with Anthony and informed him Mother had asked the court to terminate the legal guardianship if it was determined PGM was neglecting his medical needs, and he no longer wished to live there. Anthony responded, "I don't want to be here anymore. I need my space to grow." When asked to elaborate, Anthony said he was "pretty sure" Mother had her own home, and he would "have his own space compared to sharing a bedroom with" his 17-year-old paternal uncle when living with PGM. When asked if PGM was neglecting him, Anthony said he did not eat Fridays after school because PGM did not cook. He "confirmed plenty of food being in the home" but reported he did not know how to cook. He admitted he could "make himself a

13

sandwich and operate a microwave to heat up leftover or other microwaveable foods."

Anthony also reported that two years prior, he was hit by a car while riding an electric scooter, resulting in scarring on his knees and elbows. Anthony complained PGM did not ask how he felt or take him to the hospital, although he also admitted he did not tell PGM he needed medical attention. Anthony said PGM "does not take him to the doctor when he is sick with a cold nor reminds him to take his medicine when sick." Anthony denied getting sick on a regular basis. Anthony voiced his desire to have someone take care of him, which PGM could not do because she also had to care for three other kids. Anthony reported PGM did not talk to him and did not care where he went or whether he had completed his homework. Anthony believed Mother would provide him with more "attention," "structure," and "guidance."

When asked why his feelings about living with Mother had changed, Anthony responded, "I don't feel this place is for me. I'm stuck. I'm useless." He felt like "everyone's experiencing more than me," asking, "aren't kids my age supposed to drive and have an ID?" Anthony stated he had asked PGM for help to get a state identification card, but she ignored him, so he did not ask again. Anthony also claimed PGM would not give him any money. Anthony was not receptive to any advice the DI gave on how he might improve his living situation or relationship with PGM "because he was adamant that nothing will change based on her being occupied with his other siblings."

When the DI explained to Anthony that even if the court reinstated reunification services, it could take a minimum of six months to reunify with Mother, Anthony "was in disbelief" and appeared disappointed, mentioning he had only a year before he

turned 18 years old.  When asked how frequently he spoke with Mother, Anthony was unsure but stated it was not very often, perhaps once a week.

### (b)  Mother

In November 2024, the DI contacted Mother for an interview.  At the outset, the DI informed Mother "the interview may take two phone calls given that she had a mandatory training and will call her back after to resume if necessary.  Mother understood and agreed."

Mother reported that in 2022, she was receiving individual counseling from a service called "Victims of Crime- Rest Program."  Mother explained she had been the victim of domestic violence from A.W.'s father, against whom she and her daughter had a five-year restraining order that expires in February 2027.

Regarding Mother's sobriety, she stated she relapsed with methamphetamine and marijuana in 2020 but had subsequently enrolled in an outpatient drug program and had been sober since.

The DI asked Mother about her allegations that PGM was neglecting Anthony's health.  Mother repeated her claim that, when she attempted to enroll Anthony in school in 2020, she discovered he was missing multiple vaccinations.  She also claimed PGM would not take Anthony to the doctor after he was struck by a car and complained of leg pain, and that the maternal aunt took Anthony to the doctor instead.

Mother claimed she could pay more attention to Anthony than PGM.  She believed she could "provide emotional support, experience activities, help with homework, and make him hot meals."  Mother claimed PGM did not cook homemade meals and lacked the time to take Anthony to "do fun things."  She claimed Anthony wore ripped clothes and was not given money to buy

15

snacks at school. Mother could not describe how his clothes were ripped but said he brought them to the maternal grandmother for mending. Mother also reported she was sending Anthony money on a weekly basis because PGM was not giving him any. Additionally, she claimed Anthony was forced to walk home from school because PGM would not pick him up, unlike the other children in PGM's care. Mother alleged all Anthony's paternal uncles were in a gang, and worried Anthony would "fall into that lifestyle."

When the DI explained to Mother that her request to "reinstate jurisdiction" was a request for the juvenile court to "open a dependency case to service the family and support reunifying a child to their parents," Mother stated she did not know that and did not want an open case but would agree to one if that was the only way to get Anthony back.

When asked about Anthony's previous interactions with Mother's younger children, she denied any bullying, stating Anthony was just being "rough" with Victor, "but didn't hurt him."

The DI needed to leave the interview to attend her mandatory training and informed Mother she would call her back. Mother agreed. However, Mother did not answer a call the DI made that day, the next day, or the day after that.

Two weeks after the initial interview, the DI was able to speak with Mother, who stated she had ignored the DI's previous calls because she was "going through some things." The next day, the DI conducted a video assessment of the appropriateness of Mother's three-bedroom home for Anthony to visit. Mother informed the DI that, should Anthony visit, he would share a room with Mother's child Victor.

16

In mid-December 2024, DCFS received records from the Washington Department of Children, Youth, and Families (DCYF) which recounted a March 2021 referral where Mother reportedly told the referring party "that she feels afraid for her two younger children, Victor and [A.W.]. [H]er oldest son, Anthony has been choking Victor, body slamming him on the couch, bending his fingers back trying to break them, and is also assaulting to [A.W.] [*sic*]. Victor gets the worst of it. Mom said the assaults are so violent that she refuses to leave Anthony home alone with his siblings. Mom said when she has to leave the home to get groceries, etc., she makes Anthony go with her because she is afraid he will hurt his siblings if left home alone with them. . . . Mom is concerned that she cannot keep her two younger children safe. Mom was so concerned for the safety of the two younger children that she set up a video camera that shows Anthony assaulting Victor when mom stepped out of the room. When mom confronts Anthony[,] he denies he assaults his siblings. Mom has video of her stepping out of the room and when mom was not in the room Anthony choked Victor and body slammed him. Mom was especially concerned about the choking because it went on for some time. . . . Mom does not want Anthony removed from the home but needs help in keeping her children safe. . . . [The referring party] said that mom seems to be trying but does not feel capable of protecting her children for an eventual incident where one or more of them will be hurt or injured."

When DCYF investigated, Mother denied Anthony had choked Victor but admitted he would "drag Victor across the floor and . . . lay on top of him and put his arm on his chest." Mother reported "Anthony has anger issues and will throw tantrums and

she is needing some service to help deal his issues." Anthony reported being angry Mother "gave him up but kept Victor and [A.W.]"; Anthony felt Victor "took his place." He denied hurting Victor but admitted to "pick[ing] him up and toss[ing] him on the bed" and "push[ing] him and grab[bing] him." Anthony said he was "just really mad at" Victor. Victor denied Anthony choked him or bent his fingers back; he said Anthony would slam him onto the bed "like wrestling." DCYF closed the case without identifying any safety threats.

When the DI informed Mother that overnight visits with Anthony would be inappropriate in part due to "Anthony's prior aggressive behaviors towards siblings and mother's minimization of it when asked," Mother became angry that DCFS had requested and obtained these records, saying that doing so "violated her civil rights" as a victim of domestic violence. Mother refused to listen to any further explanation or suggestion from the DI.

### (c)  Maternal Grandmother

In a November 2024 conversation with the DI, Anthony's maternal grandmother claimed he visited her about two times a week. Anthony would tell her he was "stressed out" and would ask for money because he was hungry. She reported giving Anthony $20 to $25 per week because PGM did not send Anthony to school with money. She confirmed having to "sew the holes in Anthony's pants, underwear, and sweaters" and stated she had seen him wearing wrinkled and stained clothes. She believed PGM's family treated Anthony differently because they did not believe Father was Anthony's biological father.

The maternal grandmother denied any concerns with Mother's sobriety, stating that, although she lived in a different

18

state, she could "tell" when Mother was not sober, because Mother "does not remain in contact with her." When asked for the last time Mother "did not contact her for a while, MGM stated that it was perhaps a few months ago but could not recall the exact time."

### (d) PGM

PGM told the DI she had no problem with Anthony visiting Mother, as long as the flights were planned for school breaks. She stated she never prohibited Anthony from speaking with Mother, and if Anthony wanted to live with Mother, PGM would support him because he was "old enough to care for himself." In a later conversation, she qualified her support with the condition that Mother was "capable of raising Anthony." As for Anthony's medical needs, PGM stated that his immunizations were current, and that she treated his colds and coughs with over-the-counter medication. If further medical attention became necessary, she would take him to a doctor, but such a situation had yet to arise. She also contradicted Anthony's statement about not taking him to the doctor after he was hit by a car.[12] PGM explained Anthony did not tell her about the accident until the day after, when she noticed he was in pain. While Anthony insisted he did not need a doctor, PGM took him when he "could not take the pain." PGM reported Anthony sustained no major bodily injuries but was sore for some time; the doctor advised he take Tylenol for the pain.

As for school transportation, PGM stated Anthony often voluntarily chose to walk home or to go hang out with his

_____

[12] As to Mother's statement that the maternal aunt took Anthony, PGM stated the aunt offered, but PGM took Anthony herself.

19

girlfriend after school.  Anthony had not done well academically in school the previous year, leading PGM to request an assessment for an Individualized Education Program, which found him eligible for services.  He would be transferred to a new high school "next semester to make up the missed credits faster and be able to graduate high school next year."

PGM confirmed she did not cook on Fridays but stated there were always leftovers or simple meals Anthony could make on his own.  She explained Anthony wanted to be "babied," but he was old enough to do things independently and be self-sufficient.  PGM insisted she did give Anthony an allowance but no longer gave him the entire amount at once because she was concerned he would use it to buy refills for his vape pen—PGM did not know if Anthony smoked marijuana or nicotine with the vape pen.  However, PGM also stated she confiscated the vape pen a year prior and, since then, had no concerns Anthony was abusing any substances.  PGM opined Anthony got depressed over his relationship with his girlfriend and because he missed his siblings that lived with Mother.

PGM reported she bought Anthony "a new wardrobe every birthday and start of the school year."  She also claimed she bought him socks, undershirts, and undergarments periodically or whenever he told her he needed some.  She denied knowing he was taking clothes to the maternal grandmother to be mended and claimed Anthony chose to wear only a few things in his closet, speculating this repeated wear may have caused some of his clothes to tear.

Based on these interviews, DCFS again recommended the court deny Mother's petition, opining that Mother and Anthony lacked sufficient time together as the "parent-child bond is

20

limited to only telephone/virtual calls," that Mother lacked the ability to financially provide for Anthony, that Mother minimized the challenges she faced previously when Anthony came to live with her, and that Mother did not want and would not benefit from further reunification services.

In January 2025, the court denied Mother's petition without an evidentiary hearing, again "finding that there is not a change in circumstance and finding that if there were, it is not in the best interest of this child, at this time, to grant the mother's 388." Mother timely appealed.

## DISCUSSION

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence." (*Id.* at p. 846.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Stephanie M.*, at p. 319.)

21

### A. *The Court Did Not Err in Denying the Petition Because the Requested Relief Was Moot*

Mother's petition asserted that PGM "has reportedly been refusing to allow any visitation or contact between mother and the minor" and that Mother "has information and concerns received from relatives that the legal guardian is neglecting the child's medical needs and that the child no longer wishes to reside there." Mother asked the court to "[r]einstate jurisdiction to enforce mother's visitation, and to explore potential termination of the guardianship if it is determined that the legal guardian is neglecting the child's needs and if the child no longer wishes to reside there."

#### 1. Right to Visitation

Mother's right to visitation did not need to be enforced. As Mother lived in Washington, any visits would need to be planned so as not to affect Anthony's attendance at school. PGM did not object to Anthony visiting Mother over a school break. Nor did she prevent Anthony from speaking with Mother whenever he wanted; Anthony estimated he spoke to Mother on a weekly basis. Mother cites nothing in the record demonstrating her right to visitation had been impeded by anything other than her decision to move to a different state.

#### 2. Termination of Guardianship

Mother also asked the court to reinstate jurisdiction to "explore potential termination" of the legal guardianship if PGM was neglecting Anthony's medical needs *and* if Anthony no longer

22

wanted to live with PGM.[13]  It is undisputed Anthony wanted to live with Mother instead of PGM.  But the record supports the court's implied finding that PGM was not neglecting Anthony's medical needs, and thus there was no need to explore potential termination of the legal guardianship.

The only examples Mother provides of medical neglect were: (1) PGM did not take Anthony to the doctor when he had a cough or cold; (2) Anthony was found to be under-vaccinated in 2020; and (3) PGM did not take Anthony to the doctor after he was hit by a car, two years before Mother filed her second section 388 petition.

It was undisputed PGM gave Anthony over-the-counter medicine for his coughs and colds and stated she would take him to a doctor if he ever needed further medical attention. Additionally, Mother presented no evidence that, at the time she filed her petition in 2024, Anthony was missing any required vaccinations.[14]  Finally, as to whether PGM took Anthony to the doctor after he was hit by a car in 2022, the court was presented with three versions of events.  Anthony claimed PGM neither asked him how he felt nor took him to the hospital after the

---

[13] As the petition had claimed PGM was neglecting Anthony's medical needs, we read Mother's request as one to reinstate jurisdiction to explore potential termination of the guardianship if PGM was neglecting Anthony's medical needs.

[14] Moreover, California requires students to have several vaccinations to attend school, and all parties agree Anthony was attending school.  (See <https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immuniza tion/School/tk-12-immunizations.aspx> [as of October 1, 2025], archived at <https://perma.cc/W5VP-KP2V> [listing student immunizations requirements].)

23

accident. However, Anthony also admitted he did not tell PGM he needed medical attention. PGM, on the other hand, asserted she did take him to the doctor the day after the accident, when she noted he appeared to be in pain. Mother claimed PGM refused to take Anthony to the doctor, but that the maternal aunt did.

Regardless of the truth of an incident that happened over two years before it was brought to the attention of the court, the court was entitled to discredit Mother's version of events—given that she had no personal knowledge of what occurred—and conclude that either PGM did not take Anthony to the doctor because he did not tell her he needed to go, or that she did take him. Under either version of events, the court reasonably concluded PGM was not neglecting Anthony's medical needs. Therefore, because Mother only asked the court to 'explore' terminating the guardianship if Anthony no longer wanted to live with PGM and PGM was neglecting Anthony's medical needs, Mother's request was never triggered.

### B. *The Court Did Not Err in Finding Mother's Request Was Not in Anthony's Best Interest*

"[W]hen a child has been placed in foster care because of parental neglect or incapacity, after an extended period of foster care, it is within the court's discretion to decide that a child's interest in stability has come to outweigh the natural parent's interest in the care, custody and companionship of the child." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419.)

Although Anthony had lived with PGM for over a decade, Mother argues it was now in Anthony's best interest to live with her because he wanted to live with her. But Anthony wanted to live with Mother because he wanted his own space and was

24

"pretty sure" that if he lived with her, he would "have his own space compared to sharing a bedroom with" his 17-year-old paternal uncle. This did not appear to be the case. Mother lived in a three-bedroom home and stated that, were Anthony to visit, he would need to share a bedroom with Victor, Mother's younger son, with whom Anthony already had serious physical conflicts the last time he stayed with Mother. While Anthony professed his belief that Mother could pay him more attention than PGM— Anthony admitted he wanted someone to "take care" of him, while PGM insisted he needed to learn how to do things on his own—Mother was already raising two younger kids, and Anthony's last visit to Mother's home had required DCYF involvement.

It was also unclear that Mother was in a position to adequately care for Anthony. While Mother claimed to have been sober since 2020, in November 2024, the maternal grandmother claimed Mother would not stay in contact with her when Mother was not sober, and that such a period of no-contact occurred "perhaps a few months ago"—implying Mother was using drugs perhaps a few months ago. Additionally, although Mother had been involved in domestic violence with A.W.'s father resulting in a five-year-restraining order protecting both Mother and A.W., she nevertheless called him and asked him to see her during the pendency of that restraining order because she was not feeling well.[15] Further, in interviews with the DI regarding both of her section 388 petitions, Mother demonstrated that she was quick to

---

[15] Mother stated she had obtained a five-year restraining order that expires in February 2027, meaning the order was issued in February 2022. The call Mother made to A.W.'s father occurred in June 2022.

anger and easily agitated—a temperament that would make it difficult to care for a teenager also experiencing a wide range of negative emotions.

On this record, we hold the juvenile court reasonably concluded it would not be in Anthony's best interest to reinstate jurisdiction to "explore" terminating the legal guardianship.

## DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:


ROTHSCHILD, P. J.


BENDIX, J.